IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2003

## STATE OF TENNESSEE v. ERIC JAMES TAYLOR, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 71740      Richard Baumgartner, Judge**

_____

**No. E2002-00966-CCA-R3-CD**
**July 9, 2003**
_____

The Defendant, Eric James Taylor, Alias, was convicted by a jury of first degree premeditated murder and aggravated assault. The Defendant now appeals as of right from his murder conviction, alleging seven errors: (1) the trial court should have allowed him to cross-examine a prosecution witness about pending theft charges; (2) the trial court should have instructed the jury about the State's duty to preserve evidence; (3) the prosecutor impermissibly shifted the burden of proof to the Defendant during closing argument; (4) the trial court should have instructed the jury on the lesser-included offense of vehicular homicide; (5) the trial court should have allowed him to cross-examine a prosecution witness about the victim's pre-offense surgery; (6) the evidence is not sufficient to support his murder conviction; and (7) a police officer testifying for the State improperly referred to prior contacts with the Defendant. Finding no merit to the Defendant's contentions, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Susan Shipley, Knoxville, Tennessee, for the appellant, Eric James Taylor.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; and Randall E. Nichols, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Mark Wayne Morton testified that he met the victim, Joy Leanne Eastridge, at a bar in Knoxville, Tennessee, on the night of September 30, 2000. They drank some beer together and then caught a ride to the home of William Avery, a friend of Mr. Morton's. Mr. Morton, the victim, and Mr. Avery drank some beer at Mr. Avery's house. The victim then decided she wanted to return to

the bar. Mr. Morton testified that he and the victim decided to walk to a nearby store to see if they could find a ride back to the bar. Mr. Avery decided to accompany them on the walk to the store. Mr. Morton stated that none of them had a gun.

Mr. Morton testified that there was a single car in the parking lot of the "Bread Box" store when they arrived. The car was pulled into the parking lot near some pay phones; a woman was on the phone. Mr. Morton stated that he walked up to the driver in the car and asked the man if he would give them a ride for a couple of dollars. According to Mr. Morton, the driver replied, "You need to back away from my -- you need to get away from my car." The victim then approached the driver and asked, "Well, why can't you just give us a ride?" Mr. Morton then heard the driver say, "I got a .9 right here."

Mr. Morton testified that the victim and the driver continued to argue. Then, the woman on the phone returned to the car and got in. When the car started, Mr. Morton, Mr. Avery and the victim began walking away. The car backed up and then stopped. Mr. Morton testified that he then heard the car go into drive, and the engine "revved up real high." According to Mr. Morton, the car then took off and hit the victim, brushing Mr. Morton's back as it did so.

Mr. Morton explained that the driver's side of the car hit the victim, and her body went up on the hood. The driver then hit the brakes, and the victim rolled off the hood, landing on her head in front of the car. Mr. Morton testified that the driver "took off again and ran over her again." He stated that the driver's side wheels ran over the victim's chest. Mr. Morton described the vehicle's engine as "wide open" when the victim was hit the second time. The vehicle then left the parking lot.

Mr. Morton identified the Defendant as the driver of the car that hit the victim. Mr. Morton testified that there had been plenty of room for the Defendant to have exited the lot by pulling around him and the other two persons or by exiting in another direction. He stated that neither he nor the people he was with threatened either the Defendant or his companion. Mr. Morton stated that the driver's actions in running over the victim were "[d]efinitely deliberate."

William Avery also testified at trial, describing what happened in the parking lot. He, too, testified that, when he and Mr. Morton and the victim arrived at the Bread Box, there was a single car in the parking lot, pulled near the pay phones. A woman was on the phone, and a man was sitting in the car. He saw the victim speak to the woman on the phone while Mr. Morton spoke to the driver. The victim then began talking to the driver, and they argued. Mr. Avery testified that the driver got "real angry." He also testified that he heard the woman who had been on the phone tell the victim, "Bitch, you better keep your mouth shut. We are not going to give you no ride nowhere."

Mr. Avery testified that, after the car backed up, the driver put the car into drive, and he "could hear a little bit of revving up." The car then came "flying by." Mr. Avery testified that he grabbed Mr. Morton out of the car's path. He was unable to reach the victim, however, and the car hit her. Mr. Avery testified that the driver's side front fender hit the victim and she went up on the

hood. The victim then rolled off of the hood and landed in front of the car. Mr. Avery testified that the driver "[r]evved his motor up and ran over her, hit her again." According to Mr. Avery, the driver then backed up, ran over the victim a third time, and then took off.

Mr. Avery testified that there had been plenty of space in the parking lot for the driver to have avoided them, and that there were also alternate paths out of the lot. Mr. Avery testified that the driver's actions in hitting the victim were "no accident." Mr. Avery also stated that he did not have a gun and did not see either Mr. Morton or the victim produce a gun. Nor had any of them threatened the Defendant or his companion.

Dolly Bice was the woman in the car with the Defendant when he ran over the victim. She had known the Defendant for several years before the offense, and his cousin was married to Ms. Bice's sister. She stated that she was visiting her sister on the night in question and had taken several Zanax pills. The Defendant came by about midnight. About thirty minutes after his arrival, she and the Defendant decided to go to the Bread Box to use the pay phones. The Defendant drove his car, and she rode with him. She testified that no one else was at the location when they arrived and got out to use the phones. While she was on the phone she saw two men and a woman approaching. She testified that she got back in the car while the Defendant stayed on the phone.

Ms. Bice stated that, after she returned to the car, one of the men approached the driver's side, where the door was open. He bent down and looked in the car. The Defendant then returned to the car and started it. He backed up, put the car into drive, and, according to Ms. Bice, said, "I am going to kill this bitch." Ms. Bice stated that the two men and the woman were in the middle of the parking lot. The Defendant then "pushed the gas and ran over [the victim] -- put it in reverse, backed up and put it in drive, and ran over her again." Ms. Bice testified that the top part of the victim's body went up on the hood of the car and then fell back down onto the ground. Ms. Bice testified that she felt the car go "up" when it ran over the victim's body.

Ms. Bice stated that, after the Defendant ran over the victim the second time, he said, "I think I killed her." They then left the parking lot and drove to a friend's house. There, the Defendant parked the car and got into his other car. He told his friend to park the original car in the driveway beside the house. The Defendant and Ms. Bice then returned to Ms. Bice's sister's house. They passed the crime scene on the way and saw police and emergency vehicles. They did not stop.

Ms. Bice testified that the Defendant contacted her later and told her that he had spoken to the police. He told her that, when she spoke to them, she should tell them "that the people at the store were trying to rob [them] and that they had a gun." However, Ms. Bice testified that, when the Defendant began driving toward the two men and the woman in the parking lot, the strangers were posing no danger to her or the Defendant.

Officer John Kiely testified that, before the Defendant was arrested, he spoke with the Defendant over the phone about coming in to talk about what had happened. Officer Kiely testified that, during this conversation, the Defendant stated, "You don't know what it's like to kill

somebody." Officer Kiely and the Defendant set up a time for the Defendant to come into the station and make a statement, but the Defendant did not appear at the appointed time. The Defendant was later apprehended in another county and initially tried to hide from the officers who were making the arrest. Officer Kiely also testified on cross-examination that the Defendant told him that he had accidentally run over the victim when they were trying to rob him.

On October 6, 2000, Officer Timothy Schade examined the Defendant's car at the police department garage. During his inspection, he noted some damage on the driver's side front fender. He also took some photographs of the car. When shown these photographs, both Mr. Morton and Mr. Avery testified that the rims and tires in the photographs were not the same rims and tires that had been on the car when the Defendant ran over the victim.

Dr. Andrew William Sexton performed the autopsy on the victim. He testified that the victim had suffered multiple rib fractures, lacerations in the left lower lobe of her lung, two bruises to her heart, multiple lacerations to the left lobe of her liver, hemorrhage of the soft tissue surrounding her kidneys, pelvic bone fractures, two vertebral fractures, soft tissue hemorrhage in the pelvis, multiple contusions of the brain, and skull fractures. He also testified that the victim suffered extensive bleeding. He testified that the victim's injuries were consistent with blunt force trauma and with being struck by a motor vehicle. He could not state, however, how many times the victim had been run over. He described the cause of death as "multiple, blunt force injuries whereby she expired due to fatal injuries to her lungs, liver, spleen, and pelvis."

On the basis of this evidence, the jury convicted the Defendant of first degree premeditated murder of Joy Leanne Eastridge and aggravated assault of Mark Morton.

## ANALYSIS

In his first issue, the Defendant contends that the trial court erred when it refused to allow defense counsel to cross-examine Ms. Bice about a pending felony theft charge. The Defendant alleges that the pending charge "obviously provided Miss Bice with a reason to modify her testimony . . . in an effort to mollify the prosecution and was, therefore, relevant to her bias."

During a jury-out hearing prior to defense counsel beginning her cross-examination of Ms. Bice, defense counsel requested permission to inquire about Ms. Bice's pending probation revocation matter and about a pending felony theft charge. The trial court determined that defense counsel could cross-examine Ms. Bice about the pending probation revocation case and any favorable treatment she was expecting to receive from the State. The trial court further ruled that defense counsel could not cross-examine Ms. Bice about the felony theft charge, on the basis that it was not relevant.

During the jury-out discussion, defense counsel stated that she wanted to impeach Ms. Bice "as to potential areas of bias." She described the pending theft charge as a "prior bad act." Defense

counsel referred to Tennessee Rule of Evidence 616[1] and to the case of State v. Sayles, 49 S.W.3d 275 (Tenn. 2001), as support for her position, and quoted lengthy portions of the Sayles opinion. Sayles addresses a criminal defendant's right to cross-examine a prosecution witness under the confrontation clauses of the United States and Tennessee constitutions. Specifically, our supreme court made clear:

> A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. . . . The exposure of a witness's motivation in testifying is a proper and important function of cross-examination.

Sayles, 49 S.W.3d at 279 (citations omitted). An undue restriction of a defendant's right to cross-examine witnesses for impeachment purposes may violate the defendant's constitutional rights of confrontation. See id.

At the motion for new trial, defense counsel argued that the trial court had committed reversible error in refusing to allow her to cross-examine Dolly Bice about the pending theft charge, referring the court to Tennessee Rule of Evidence 608.[2] A discussion ensued as to the basis on which defense counsel had requested to cross-examine the witness on this matter at trial. The trial court reviewed the trial transcript and determined that the "entire focus of [the discussion at trial was] really a [Tennessee Rule of Evidence] 609[3] analysis." The trial court explained that "prior bad acts [are] really covered by [Tennessee Rule of Evidence] 404,[4] and specifically, crimes are covered by Rule 609." The court concluded that Rule 608 had never been argued to the court at trial: "The Court was never specifically asked to allow it in as a specific instance of a prior conduct to attack her credibility as a witness." For that reason, the trial court concluded that it had not committed error in refusing to allow the requested cross-examination.

The State argues on appeal that the Defendant is offering a different legal theory to this Court than that offered to the trial court, stating "[t]here was no mention of Tennessee Rule of Evidence 608 during the jury-out hearing concerning this matter." Accordingly, the State asserts, the Defendant's argument must fail. See State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993) ("An appellant cannot change theories from the trial court to the appellate court.")

---

[1] "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."

[2] Rule 608 provides that a witness may be cross-examined about specific instances of conduct where probative of the witness's truthfulness or untruthfulness, subject to certain prerequisites.

[3] Tennessee Rule of Evidence 609 addresses impeaching a witness by evidence of a prior conviction. This Rule was clearly inapposite because the conduct at issue was a pending theft charge, not a conviction.

[4] Rule 404 addresses the admissibility of prior bad acts by a witness where such acts are probative of some matter other than the character of the witness in order to show action in conformity with that character trait.

Initially, we acknowledge that defense counsel presented this issue at trial in a less-than-artful manner. As pointed out by the State, she did not mention Rule 608 to the trial court. However, she did mention Rule 616 and the Sayles case, both of which address cross-examining a witness for bias. If a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial, then there is certainly the possibility that the prosecutor's office is going to take favorable testimony into account when subsequently prosecuting the witness's pending charge. Obviously, then, the potential for bias exists in such a situation. In this case, however, the record before this Court does not reveal in which jurisdiction the felony theft charge was pending. If it was a federal charge, then it had much less relevance as a source of potential bias than if it were pending in the same district as the Defendant's charges. The trial court ruled the pending charge "not relevant." Absent information to the contrary, we must accept the trial judge's determination. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) ("In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence.")

Moreover, even if the trial court erred in refusing to allow the requested cross-examination, we hold the error to be harmless beyond a reasonable doubt. See Sayles, 49 S.W.3d at 280. In making this determination, our supreme court instructs us that

> [t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

In this case, defense counsel cross-examined Ms. Bice about her pending probation revocation case, and established that it was set to be heard about three weeks after the Defendant's trial. Ms. Bice admitted that she did not want to spend two years in jail, which would result if her probation was revoked. Thus, defense counsel was able to firmly establish that Ms. Bice had a motive to testify favorably for the State. On cross-examination, defense counsel was further able to establish that, during Ms. Bice's statement to the police a few days after the offense, she never mentioned that the Defendant stated his intention to kill the victim prior to running over her. In her statement to the police, Ms. Bice also admitted that she initially lied to the investigating officer when she told her that the Defendant had run over the victim only once. The statement also indicates that Ms. Bice thought one of the two men in the parking lot had been trying to steal the car and that

she had been afraid of the people in the parking lot.[5] This evidence provided the jury an opportunity to infer that Ms. Bice changed her story at trial in favor of the State. Indeed, during closing argument, defense counsel argued this point strongly:

> But you know what Dolly Bice did not say at all in that original tape-recorded statement that she gave to Donna Mynatt? She did not say a single solitary word about the thing [the prosecuting attorney] opened his case up with. She did not say anything about [the Defendant] saying, "I'm going to kill the bitch." That is an invention. That is an embellishment, and that is a damnable lie, and that is something that he started his case with, and there's a reason for that. And you know that Dolly Bice has her own reasons. You heard that she's got a probation revocation pending against her for something totally unrelated to this. They've reset that hearing five times, and it's set now [three weeks hence]. She's certainly got a reason to lie to you. She's got two years of her life on the line.

Of course, Ms. Bice was the only witness who testified that the Defendant stated an intention to kill the victim. However, two other eye-witnesses to the crime testified that the Defendant deliberately ran over the victim after an argument with her, not once, but twice. The Defendant argues that Ms. Bice's testimony was crucial to establishing the element of premeditation necessary for the Defendant's conviction of first degree premeditated murder. We disagree. Even if Ms. Bice's testimony had been fully discredited, the testimony of Mr. Avery and Mr. Morton was sufficient, in and of itself, to establish premeditation (which element is discussed in further depth below).

Accordingly, we are confident that, based upon the entire record in this case, any error by the trial court in this regard was harmless beyond a reasonable doubt. This issue is, therefore, without merit.

In his second issue, the Defendant contends that the trial court erred when it refused to give the jury an instruction on "the spoilation of evidence" with respect to the State's failure to obtain a toxicological analysis of the victim's blood, although ordered by the trial court to do so, and the State's additional failure to preserve a videotape from the surveillance cameras of a business near the Bread Box.[6] The Defendant argues that the toxicological testing might have indicated that the

---

[5]A transcript of Ms. Bice's statement to the police, which had been tape-recorded, is included in the record and contains multiple inconsistencies when compared with her trial testimony. Because the transcript was made an exhibit to Ms. Bice's testimony, the jury was given an opportunity to compare the two accounts of the events by this witness. Indeed, it was encouraged to do so by defense counsel during closing argument.

[6]Defense counsel requested the trial court to charge the jury as follows: "The [S]tate has a duty to gather, preserve and produce at trial evidence which may be helpful to the defendant. Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. If, after considering all the proof, you find that the State failed to gather or preserve evidence, the contents and qualities of which are in issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent
(continued...)

victim was under the influence of alcohol or other substances, and that such evidence "may have been relevant to show [the victim's] state of mind and aggressiveness at the time of the homicide." He further argues that a videotape from the neighboring business "could have captured not only the movement of the car, but also the persons involved."

Our supreme court has held that, "[g]enerally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999) (footnote omitted). However, due to the difficulty of defining the boundaries of this duty, our supreme court appeared to adopt in Ferguson the boundaries determined in a decision of the United States Supreme Court:

> Whatever duty the [federal] Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Ferguson, 2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2533-34, 81 L.Ed.2d 413 (1984)). Where the duty is established and the proof demonstrates that the State failed in that duty, three factors must be considered in order to determine whether the loss of the evidence undermined the defendant's fundamental right to a fair trial. Those factors are:

1. The degree of the State's negligence in failing to preserve the evidence;

2. The significance of the lost evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

See id., 2 S.W.3d at 917. If, upon consideration of these factors, it is apparent that the defendant's right to a fundamentally fair trial has been compromised by the missing evidence, then curative action should be taken. See id. One method of protecting the defendant's rights is through an appropriate jury instruction. See id.

With respect to the court-ordered testing of the victim's blood, the toxicology report was neither lost nor destroyed: it was simply never produced. The Defendant's argument is therefore misplaced with respect to this issue. The order in question was filed on September 24, 2001. The

---

[6](...continued)
evidence would be favorable to the defendant. Investigation which is thorough and conducted in good faith may be more credible, while an investigation which is incomplete, negligent or in bad faith may be found to have lesser value or no value at all. In deciding the credibility of the witnesses, and the weight, if any, to give the prosecution evidence, consider whether the investigation was negligent and/or conducted in bad faith." This requested instruction is based upon a suggested jury instruction set forth in State v. Ferguson, 2 S.W.3d 912, 917 n. 11 (Tenn. 1999).

Defendant's trial was not held until April 22, 2002. Defense counsel therefore had ample time and opportunity to follow up on the court's order and make the necessary motions in the event of the State's failure to comply with the order. In our view, defense counsel's failure to do so constitutes a waiver of any right to complain about the State's failure at this late date. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.") Moreover, even if the State failed in its duty to produce this evidence so as to bring this issue within the parameters of Ferguson, we find that the failure did not impact the Defendant's fundamental right to a fair trial. At best, the toxicology report would have established that the victim was under the influence of some substance at the time of her death. However, other proof at trial established that the victim had been drinking beer on the evening in question. Thus, the toxicology report would have been cumulative evidence. Moreover, additional proof that the victim was under the influence of alcohol and/or some additional substance at the time of her death would not have established a defense for the Defendant. The Defendant argues in his brief that evidence of the victim's intoxication "may have been relevant to show her state of mind and aggressiveness at the time of the homicide." We fail to see how. Mere proof of the victim's intoxication would not have been proof of any particular behavior on the victim's part. Accordingly, the significance of the toxicology report would have been minor, at best, and its omission from the Defendant's trial in no way undermines the reliability of the jury's verdict. The trial court therefore committed no error in refusing to give the requested jury instruction, and the Defendant is entitled to no relief on this issue.

With respect to the alleged videotape, the proof at trial established that Meraserve Roofing Company was located across the street from the Bread Box. Officer Gerald Smith testified that he had observed a couple of security cameras at the roofing company when he visited the crime scene. He further testified that "there was a possibility that those cameras could have depicted some of the scene [at the Bread Box parking lot]," but that he could not determine the exact angle at which the cameras were aimed. Officer Smith testified that he never seized any film from the roofing company's cameras. There was no further proof adduced at trial about what, if anything, the roofing company's cameras may have filmed that night.

The Defendant asserts that the State had the duty to gather any evidence which may have been contained in the roofing company's video cameras. In Foster v. State, 942 S.W.2d 548, 550 (Tenn. Crim. App. 1996), this Court recognized that, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution has a duty to search possible sources for exculpatory information. However, the duty is "limited to examining 'non-trivial prospect[s]' of material exculpatory information." Foster, 942 S.W.2d at 550 (quoting United States v. Brooks, 966 F.2d 1500, 1504 (D.C.Cir. 1992)). In this case, the prospective source for information were the video cameras located at a business across the street from the parking lot where the victim was killed. However, there was no testimony at trial that the video cameras were operating on the night in

question, or that any videotape even exists, much less that it contains exculpatory information.[7] Defense counsel was aware of the video cameras prior to trial; she cross-examined Officer Smith about them. Yet, defense counsel put on no proof through the roofing company's proprietor, or otherwise, that the video cameras contained potentially exculpatory information. It is the defendant's burden in a criminal trial to establish that the State has failed to conform with the requirements of Brady. See State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

The Defendant's allegations concerning the videotape are based on pure speculation, at best. We are not prepared to assume, on the basis of pure speculation, that the State failed to discover exculpatory information in violation of the Defendant's due process rights under Brady. Nor are we prepared to fault the trial court for refusing to instruct the jury that the State failed to preserve evidence when the existence of that evidence has never been established. Accordingly, we find the Defendant's allegations regarding the State's failure to discover and/or produce evidence, and the trial court's ruling regarding jury instructions thereon, to be without merit.

In his third issue, the Defendant contends that he is entitled to a new trial because of improper prosecutorial comments during defense counsel's closing argument. Defense counsel began her argument with the following:

> Ladies and gentlemen, the prosecution has not provided you-all with proof in this case. The reason they haven't is because their witnesses have not provided it to them. So y'all are going to get the indictment to take back with you. It's going to list some witnesses. The first witness you're going to see is Donna Mynatt, KPD investigator. She's the prosecuting investigator. Her name is on here twice. They didn't call her. You didn't hear a peep from her. There's a reason for that. There's reasons for everything. There's a reason for that. They didn't want you to hear the different versions that Mr. Morton and Mr. Avery gave her. They didn't want you to hear that. They didn't want you to –

At that point, the prosecutor objected as follows:

> Your Honor, I object to that. Joe Huckleby took that statement. He was here this morning. [Defense counsel] released him. I object to that.

The trial court responded to the prosecutor by saying, "I'm going to let you argue." The Defendant now contends that the prosecutor's objection "implicitly argued that defen[se] counsel was somehow obligated to call a witness to the stand to establish evidentiary points," and so improperly shifted the burden of proof to the Defendant.

---

[7]During the jury charge conference between the trial court and counsel, the prosecuting attorney stated that it was his understanding "that the police department did look at that tape [from the roofing company videocamera], and it shows nothing. It doesn't show that parking lot." The prosecuting attorney further stated that a police officer "made [defense counsel] aware of that fact." Defense counsel did not dispute these remarks.

Initially, we note that defense counsel made no response to the prosecutor's objection, and did not request either a curative jury instruction or a mistrial. Accordingly, the Defendant will not now be heard to complain. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Furthermore, even where a prosecutor's remarks are improper, reversal is not required unless the impropriety "affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). Factors relevant to that determination include:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

See State v. Nesbit, 978 S.W.2d 872, app. 900 (Tenn. 1998).

In this case, the prosecutor's comment about defense counsel's failure to call Officer Huckleby was limited to his objection. Thus, the comment was limited in both time and scope. Subsequent to closing argument, the trial court instructed the jury that "The state has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the state throughout the trial of the case. The defendant is not required to prove his innocence." Juries are presumed to follow the trial court's instructions. See State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). Finally, the proof in this case was quite strong. We are confident that the prosecutor's objection had no affect on the jury's verdict. Accordingly, this issue is without merit.

In his fourth issue, the Defendant argues that the trial court committed reversible error in failing to instruct the jury on the offense of vehicular homicide. The Defendant argues that vehicular homicide is a lesser-included offense of first degree premeditated murder under State v. Burns, 6 S.W.3d 453 (Tenn. 1999), and should therefore have been charged to the jury. However, this Court has previously held that vehicular homicide is not a lesser-included offense of first degree premeditated murder under Burns. See State v. Harvey Phillip Hester, No. 03C01-9704-CR-00144, 2000 WL 294964, at *8 (Tenn. Crim. App., Knoxville, Mar. 22, 2000). Accordingly, this issue is without merit.

Next, the Defendant complains about the trial court's refusal to allow defense counsel to cross-examine Dr. Sexton about surgery to the victim's wrist and an accompanying incision in her pelvic region for a skin-graft. The Defendant asserts that the surgery was necessitated by the victim's use of intravenous drugs and that proof of the surgery was relevant to establish that her visit to the Bread Box was in order to obtain narcotics, "and that the [D]efendant's response to his encounter with her and his objection to allowing her and her strange male companions to get into his vehicle must be viewed in that context." The Defendant contends that the trial court's ruling violated his constitutional rights to present a defense, relying on State v. Brown, 29 S.W.3d 427 (Tenn. 2000).

The admissibility of evidence rests within the sound discretion of the trial court. See State v. James, 81 S.W.3d 751, 760 (Tenn. 2002). We will not disturb a trial court's ruling regarding the admissibility of evidence absent an abuse of that discretion. See id. We will not find an abuse of discretion unless it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning and caused an injustice to the party complaining. See id.

There has been no abuse of discretion in this instance. The Defendant sought to introduce proof of the victim's prior bad acts in order to establish her motive for being in the parking lot at the Bread Box. Under Tennessee Rule of Evidence 404(b), evidence of prior bad acts in order to establish motive may be admissible. See State v. Robinson, 73 S.W.3d 136, 151 (Tenn. Crim. App. 2001). However, before any evidence is admissible, it must be relevant. See Tenn. R. Evid. R. 402. Here, the trial court ruled that the reason for the victim's surgery and skin graft was not relevant. We agree. Any prior drug use by the victim, whom the Defendant had never met, has no relevance in this case to any defense arguably available to the Defendant. Furthermore, even if the victim had been seeking to buy drugs from the Defendant, that would not establish a defense to first degree premeditated murder under the facts of this case. The Defendant has failed to demonstrate that the trial court abused its discretion in refusing to allow Dr. Sexton to be cross-examined about the reasons for the surgery to the victim's wrist. This issue is without merit.

In his penultimate issue, the Defendant challenges the sufficiency of the evidence in support of his first degree premeditated murder conviction. Specifically, he contends that there is not sufficient evidence of premeditation.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102,

105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree murder is the premeditated and intentional killing of another. See Tenn. Code Ann. § 39-13-202(a)(1). A premeditated murder is done "after the exercise of reflection and judgment." Id. § 39-13-202(d). Our statute further instructs that

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "The element of premeditation is a question of fact to be resolved by the jury." State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be established by proof of the circumstances surrounding the killing. Id. Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; and calmness immediately after the killing. Id.

In this case, the proof established that the Defendant told Ms. Bice that he was "going to kill" the victim. By all accounts, the victim was not armed. According to all three eye-witnesses, neither the victim nor the two men in the lot were posing any danger to the Defendant. Nevertheless, after backing out of his parking place, the Defendant placed his vehicle in drive, revved the engine, and then utilized his vehicle as a deadly weapon, striking the victim with the left front fender. When the victim rolled off the hood of the Defendant's car onto the pavement, the Defendant ran over the victim a second time. One eyewitness testified that the Defendant then ran over the victim a third time before leaving the parking lot. The Defendant's actions broke many of the victim's bones and caused extensive bleeding. The Defendant then drove to a friend's house and made arrangements to hide the car, after which he got into his other car and then drove back by the crime scene. The Defendant did not stop to confirm the results of his actions, but returned to Ms. Bice's sister's house.

These factors are sufficient to support the jury's finding that the Defendant killed the victim with premeditation. This issue is without merit.

Finally, the Defendant contends that he is entitled to a new trial because Officer Keily testified that, during a phone conversation with the Defendant, the Defendant stated, "I have dealt with you before." Prior to trial, the trial court granted the Defendant's motion in limine as to any proof regarding the Defendant's prior convictions and other pending charges. The Defendant now argues that Officer Keily's testimony violated the court's order and further permitted the jury to "speculate wildly about the nature of prior contacts" between him and the officer.

We disagree. Officer Keily was testifying about a phone conversation he had with the Defendant prior to the Defendant's arrest. Officer Keily stated:

> I said, "I need you to come talk to me." [The Defendant] asked me, "What is it about?" I said, "Well, you know what it's about." I said, you know, "Let's don't talk on the phone." I said, "Come up here, and let's get your side of the story, get it aired out. That way, you won't have to look behind your back," And [the Defendant] blurted out and said -- he said, "Man" -- he said, "I will talk to you." He said, you know, "I trust you. I have dealt with you before." He said, "You don't know what it's like to kill somebody."

There was no mention made of what the Defendant's prior dealings with Officer Keily consisted of. Certainly, there are a multitude of reasons for a citizen to have prior dealings with a police officer. The Defendant may have been a witness in another criminal investigation; he may have been a victim of a crime; he might have functioned as an informant at some point. As recognized by the Defendant, however, any conclusion would be based on speculation.[8]

Our Rules of Criminal Procedure provide that "[n]o judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a). First, we are not convinced that Officer Keily's testimony contravened the trial court's pre-trial order; that is, we are reluctant to conclude that Officer Kiely's testimony constituted an error. Second, even if Officer Keily's testimony was in violation of the court's order, we find any error thereby committed to be harmless. That is, Officer Keily's testimony, even if error, does not affirmatively appear to have affected the result of the trial on the merits. Accordingly, this issue is without merit.

The judgment of the trial court is affirmed.

---

[8] We note that, at the conclusion of Officer Keily's testimony, defense counsel lodged an objection on this point. She declined the trial court's offer of a curative instruction, however, on the basis that an instruction would simply refocus the jury's attention on the offending statement.

_____
DAVID H. WELLES, JUDGE